Charles W. Yeager and Helen A. Yeager v. Commissioner.
Yeager v. Commissioner
Docket No. 66883.
United States Tax Court
T.C. Memo 1959-41; 1959 Tax Ct. Memo LEXIS 207; 18 T.C.M. (CCH) 192; T.C.M. (RIA) 59041; February 27, 1959
Edward I. Wallach, Esq., 1010 Society for Savings Building, Cleveland, Ohio, for the petitioners. Maurice B. Townsend, Jr., Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The Commissioner has determined a deficiency in petitioners' income tax in the amount of $12,717.72 for the taxable year 1953. The issue for decision are (1) whether the initial payments received by petitioners on the sale of real property *208 were not in excess of 30 per cent of the sales price thereof so as to permit their reporting of the gain on the sale on the installment method under section 44(b) of the Internal Revenue Code of 1939 and (2), as an alternative, should decision be adverse to petitioners on the first issue, whether the real property received by petitioners as part payment for the property referred to in issue 1 was a capital asset in their hands, so that a deduction for a loss incurred on the simultaneous sale of such property was subject to the limitations imposed by the provisions of section 117(d)(2) of the Internal Revenue Code of 1939. Findings of Fact Petitioners are husband and wife residing in Beachwood Village, Ohio. They filed their joint income tax return for the year 1953 with the director at Cleveland, Ohio. Prior to June 29, 1953, petitioners were the owners of real estate located at Hollywood Beach, Florida, known as and hereinafter referred to as the Neptune Apartments. Early in that year petitioners became desirous of selling the Neptune Apartments and not remaining in the business of operating an apartment hotel and, for that reason, entered into an exclusive listing contract *209 for the sale of Neptune with two real estate brokers in Hollywood. The sales price indicated in the listing contract was $300,000, and it was there specifically provided that the sellers (petitioners) were to receive a net amount over commissions to the brokers of $275,000. During the period of the exclusive listing the brokers were unable to effectuate a sale of the property. However, they continued their efforts to obtain a purchaser to the end that on June 29, 1953, petitioners agreed in writing to sell the Neptune Apartments to purchasers provided by the brokers for a stated purchase price of $325,000, payable $50,000 in cash and the allowance of a credit on the down payment in addition thereto of $75,000 in return for a warranty deed to an apartment hotel owned by the purchasers known as the Breakers Apartments, which was located on Lot Nos. 11, 16, 17, 18, and 19, Block 3, Hollywood Beach, First Addition. The remainder of the purchase price was to consist of the assumption of a first and second mortgage by the purchasers in the respective amounts of $30,000 and $2,000 and a third mortgage to be given by the purchasers in the amount of $168,000. Sometime prior to agreeing to the *210 above purchase and sale, petitioners consulted their attorney with respect to the transaction and were advised by him to obtain three different appraisals of the Breakers Apartments at an amount not less than $75,000. Following this advice, petitioners purchased from three separate individuals in Hollywood, for $20 each, letters of appraisal, each of which indicated a value of the Breakers Apartments - one at $76,500, one at $78,500, and one at $79,800. Prior to the submission to petitioners of the terms of the proposed purchase and sale agreement, the purchaser individualy proposed the sale including the trade-in of the Breakers to petitioner Charles Yeager, hereinafter referred to as petitioner. Petitioner refused to consider any transaction which involved a trade-in of property. Subsequent thereto, upon submission of the proposed terms of sale by the real estate broker, Nicholas Terranova, petitioner again refused to consider the sale because of the proposed trade-in of the Breakers. However, he informed Terranova that if the transaction could be so carried out as to provide petitioner with a net purchase price of either cash, mortgages, or the equivalent, in the amount of $275,000, *211 he would accept the deal and proposed that the submitted transaction might be acceptable if Terranova could obtain an immediate buyer for the Breakers; whereupon Terranova agreed, upon condition that petitioner would carry out the proposed sale of Neptune Apartments, to purchase the Breakers himself at a purchase price of $35,000, with a credit of $5,000 represented by commission to Terranova for his services in the sale of the Neptune Apartments. This, petitioner agreed to and the sale of Neptune Apartments upon the terms above indicated and the sale of the Breakers upon the terms indicated were simultaneously carried out at an undisclosed time during the summer of 1953. Beginning with the time when the above sale of Neptune Apartments was proposed to petitioners, they never believed the Breakers, together with the vacant land contiguous thereto and the furnishings and equipment of the apartment hotel itself, was worth $75,000. They had no intention of and did not at anytime hold the Breakers, its equipment, furnishings, or land contiguous thereto, other than for immediate resale. Upon the consummation of the transactions above set forth, Terranova, the broker, immediately took *212 possession of and moved into the Breakers and operated the same as an apartment hotel for approximately one year. He found the Breakers to be in need of repair and he, his wife and son proceeded to repair the same insofar as they were individually capable of doing so and, so far as they were not so capable, such repairs were effectuated through outside materialmen and labor which were paid for by Terranova. On May 31, 1954, he sold the Breakers and its contents for a sales price of $50,000 except that only lot Nos. 11, 18, and 19 were included in such sale. As a part of the purchase price Terranova received real estate from the purchaser which we find to have been of the value of $13,500. The net income realized from petitioners' operation of Neptune Apartments for the year 1953 was reported in their income tax return as $21,017.10. Terranova's gross income from the operation of the Breakers during the time he owned and operated the same was approximately $4,500. In reporting their gain on the sale of the Neptune Apartments in 1953 petitioners showed the sales price to be $285,000 and the Breakers is therein allotted, in determining the percentage of the total sales price received *213 by petitioners in initial payments, a sales price of $35,000. In computing the deficiency the Commissioner has not applied the installment sales provision of section 44(b) of the 1939 Code and in lieu thereof has computed petitioners' income by including in gross income their entire net gain from the sale of the Neptune Apartments. In 1953 petitioners sold the Neptune Apartments at a sales price of $285,000. The fair market value of the Breakers received by petitioners as part of the initial payment on the sales price of the Neptune Apartments was $35,000. Opinion Resolution of the issue here presented depends entirely upon the factual determination as to the value of the Breakers apartment hotel and the amount of the actual sales price at which petitioners sold the Neptune Apartments. Because of our decision of the first issue, it will be unnecessary for us to discuss petitioners' alternative claim. It seems clear to us that, although petitioners' sales price as originally designated in their contract for an exclusive listing with their real estate brokers was $300,000, their desire to extricate themselves from the hotel business prevailed upon them eventually to accept a *214 lower amount. This is true in part at least because their real estate broker agreed to and did accept a commission of $5,000 rather than the amount petitioners had agreed to pay him in the exclusive listing, i.e., $25,000. The result was that the net sales price received by them for Neptune exceeded the price at which they were originally willing to sell by $5,000. There is no showing here by either party, other than the fact of the sale itself, with respect to the true market value of the Neptune Apartments on the date of its sale. That the fair market value of the Breakers, which value forms a part of the initial payment on the purchase price of the Neptune Apartments, was much less than $70,000 seems clear to us. Terranova, who purchased the Breakers, although he was not clothed in the habiliments of the traditional expert on real estate appraisals, was nevertheless, we feel, competent to testify to the value of the Breakers in view of his being then engaged in the real estate brokerage business and his past experience therein, both in Florida and elsewhere, and in view of the fact that he was a purchaser thereof. Respondent argues strongly that his testimony as to the value of *215 the Breakers is not admissible for the reason that he cannot be said to be an arm's length purchaser. However, we feel that, even so, his tendency as a real estate broker and a purchaser would necessarily be to value the property at its true market value. It is noted also that one of the best and most often relied upon criteria with respect to fair market value is sales. Halbert K. Hitchcock, 4 B.T.A. 273; Vivian B. Allen, 3 T.C. 1224; Estate of Frank Miller Gould, 14 T.C. 414. Only after Terranova had improved and operated the Breakers for approximately a year was he able to sell the property at a price of $50,000, included within which was property traded in at a value of $15,000 which we find was actually valued at but $13,500. It is true that Terranova's sale of the Breakers did not include some of the property which he had received in his purchase from petitioners, which consisted of several vacant lots contiguous to the Breakers. We find nothing in the record, however, which would indicate that those unsold lots were of such value as to detract from the weight to be given the sales price at which Terranova disposed of the Breakers. Having *216 determined that the actual sales price of the Neptune Apartments was $285,000 and that the fair market value of the Breakers was $35,000, it follows as a mathematical certainty that petitioners were correct in reporting their gain upon the sale of the Breakers on the installment basis under section 44(b) of the 1939 Code. Decision will be entered under Rule 50.